UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA


UNITED STATES OF AMERICA      )
      )
      )
v.      )      Case No. 1:12-cr-29-CLC-SKL
      )
      )
MAURICE RENALDO CARTER      )


REPORT AND RECOMMENDATION

Attorney William B. Carter, Jr., on behalf of Defendant Maurice Renaldo Carter ("Defendant"), filed a motion for an additional mental evaluation performed pursuant to 18 U.S.C. § 4241 to determine Defendant's mental competency [Doc. 31]. The motion is before me pursuant to 28 U.S.C. § 636(b)(1)(B) to conduct such evidentiary hearings as deemed necessary and to issue a report and recommendation as to Defendant's mental competency.

I.      BACKGROUND

Defendant has been indicted for alleged violations of 18 U.S.C. § 922(g)(1), felon in possession of firearms and ammunition; 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), possession with intent to distribute cocaine base ("crack"); and 18 U.S.C. § 924(c), possession of a firearm in furtherance of a drug trafficking crime [Doc. 1]. Defendant pleaded guilty to all three counts of the indictment in exchange for the undertakings of the government in a written plea agreement [Docs. 13 & 14]. In taking the Defendant's pleas on June 13, 2012, I determined Defendant was competent to enter guilty pleas, an assessment supported wholeheartedly by all parties and counsel at the time of the change of plea proceedings. Shortly thereafter and before the time expired for filing objections to

my recommendation to accept Defendant's guilty pleas, however, Defendant moved to withdraw his guilty pleas [Doc. 15] and moved for a mental evaluation [Doc. 16].

Defendant's motion for a mental evaluation was granted, and Defendant was evaluated. As a result of Defendant's first forensic evaluation, a report prepared by forensic psychologist Dana Brauman, Psy.D, finding Defendant was not currently competent to stand trial or plead guilty was filed under seal [Doc. 26]. The parties then jointly moved for an order finding Defendant incompetent and committing Defendant to a federal medical center for treatment for restoration to competency pursuant to 18 U.S.C. § 4241(d) [Doc. 23]. The Court granted the joint motion in an order of commitment [Doc. 27]. Upon Defendant's return from the commitment period, a forensic report prepared by forensic psychologist Carlton Pyant, Ph.D. and neuropsychologist Tracy Pennuto, J.D., Ph.D.[1] concluding Defendant was now competent to stand trial or plead guilty was filed under seal [Doc. 33].

Defendant then filed a motion requesting time and money to obtain the services of another psychologist [Doc. 31], which was granted [Doc. 37]. Subsequently, a report prepared by clinical psychologist David A. Solovey, Ph.D., P.C. finding Defendant was not currently competent was also filed under seal [Doc. 43]. Pursuant to 18 U.S.C. §§ 4241 and 4247, a competency hearing was held September 26, 2013, during which the doctor/authors of the various reports testified and their reports were accepted as evidence. Post-hearing briefs were filed by the government and Defendant [Docs. 45, 46, 47 & 48], and this matter is now ripe.

---

[1] During the hearing, Dr. Pennuto noted her failure to sign the report was mere oversight.

## II.    FACTS

It is undisputed Defendant suffered a traumatic brain injury after being shot in the head in 1986.  As argued by the parties, this case presents a classic "battle of the experts," with two doctors finding Defendant was or is not competent and two doctors finding Defendant is now competent (and questioning that he was ever incompetent).  In addition to adopting their respective reports in their testimony, the doctors testified in relevant part as noted below.[2]

### A.    First Evaluation

Defendant's first mental evaluation was conducted by Dr. Brauman, a forensic psychologist at the Metropolitan Correctional Center ("MCC") in New York, a facility operated by the Federal Bureau of Prisons ("BOP").  Dr. Brauman, who has worked at the MCC since 2010, evaluated Defendant during the period of July 25, 2012 through August 28, 2012.  She spent approximately seven hours with Defendant over nine occasions during the one-month evaluation period and also relied on the reports of other staff who spent additional time with Defendant.

Dr. Brauman testified that, at the time of her evaluation in 2012, Defendant was not competent to stand trial or plead guilty because he suffered from dementia due to traumatic brain injury and dysthymic disorder.  Dr. Brauman found Defendant to be cooperative--to the point of being overly compliant, depressed, and experiencing memory deficits.  Dr. Brauman testified that she stands by her conclusion that Defendant was incompetent at the time of her evaluation, however, she also noted it had been almost a year since she evaluated him and she could not speak to Defendant's current condition.

---

[2]  Each expert's curriculum vitae was made an exhibit during the hearing.

With respect to her evaluation, Dr. Brauman testified Defendant did poorly on the Validity Indicator Profile test ("VIP"), making the test results invalid. Dr. Brauman, who administered the VIP to Defendant, testified Defendant's responses to the test were so irrelevant that they led her to the conclusion he had an extremely limited capacity to understand even the simplest of items. His results on the VIP could indicate he was disengaged in the process/not interested in following the directions or could indicate cognitive limitations, but she opined in this case it was due to cognitive limitations. She based this opinion, in part, on the fact that Defendant seemed to be upset when he missed questions and he also appeared to be engaged in the process or, in other words, trying.

She also administered the Test of Memory Malingering ("TOMM") to Defendant to evaluate whether he was malingering. Defendant did well, scoring 48/50 on trial one, and 50/50 on trial two. Though the TOMM has a third trial, she did not administer it to Defendant. Based on the TOMM results, Dr. Brauman opined Defendant was giving his best effort in the evaluation process and was not malingering.

She found Defendant had only a limited rational and factual understanding of court proceedings so he could not properly assist his counsel or make adequate decisions. Dr. Brauman noted Defendant had some understanding of the legal process, such as understanding the amount of time he was facing if convicted and the ability to plead "guilty" or "not guilty." Defendant also knew he had to tell the truth in court and he could understand and define basic terms such as witness, evidence, sentence, judge, prosecutor, and defense attorney. Defendant said that when he did not understand something he was embarrassed to tell his attorney that he did not understand. Dr. Brauman admitted Defendant demonstrated some advanced understanding of the federal judicial system when he said he would be willing to cooperate with the government to obtain a better

4

outcome for himself.

While Defendant had memory issues as a result of his head injury, at times he showed signs of average recall. Specifically, Defendant initially told Dr. Brauman that he did not have any prior arrests or convictions, but when she specifically asked him about an assault case from 1987, he provided facts regarding, and reasons for, this criminal activity.

Dr. Brauman's report suggests Defendant could be made competent to stand trial. She indicated Defendant's prognosis and ability to be restored to competency was possible, but might be limited due to the nature and age of his brain injury.

When asked about why she thought Defendant's responses or motivation to perform on the tests during his competency restoration at the BOP Federal Medical Center in Butner, North Carolina ("Butner") were markedly different, Dr. Brauman opined there were at least three possibilities: issues with rapport with the Butner examiners, a continued decline in his mental functioning, or an increase in his depressive state. While not changing her opinion regarding Defendant at the time she saw him, Dr. Brauman seemed to defer somewhat to the second BOP evaluation (as long as the evaluation was properly conducted) because it was conducted over a longer period of time and included evaluation by a neuropsychologist. Based on Defendant's brain trauma, Dr. Brauman indicated a neuropsychologist would be best suited to evaluate Defendant's cognitive abilities.

B.    **Commitment and Second Evaluation**

As noted above, on the basis of Dr. Brauman's report, Defendant was committed for competency restoration at Butner where he was evaluated by Dr. Pyant, a forensic psychologist who has worked at Butner for 13 years and who is a United States Public Health Service Officer assigned to the BOP. Defendant was also examined by Dr. Pennuto, a neuropsychologist. Dr. Pyant, Dr.

5

Pennuto, and others evaluated Defendant at Butner during the period from November 20, 2012 to March 25, 2013, with Dr. Pennuto's evaluation and testing occurring mostly in March. In their professional opinions, Defendant does not currently suffer from a mental disease or defect such that he is unable to assist his counsel or properly participate in his own defense. Indeed, it appears both doctors have concluded Defendant was never incompetent.

Dr. Pyant testified that he saw Defendant intermittently over the four month period Defendant was at Butner, and he also consulted with other caretakers at Butner regarding their impressions and observations of Defendant. Dr. Pyant noted Defendant was depressed upon his arrival at Butner, but did not qualify that depression as "severe" even though Defendant was "tearful."

In Dr. Pyant's experience, inmates suffering from dementia have difficulties following the rules of day-to-day living at Butner without help, but Defendant did not. Dr. Pyant testified Defendant adapted well to the structure at Butner: he showed up at appropriate times for various activities such as exercise in the yard, he regularly attended meetings, and he exhibited good hygiene. Dr. Pyant testified a person suffering from dementia would not normally remember the proper times to report to the "pill line" or for exercise and would often report for such things at the wrong time, but Defendant did not exhibit such behavior. As another example, Defendant also never forgot to get the proper passes necessary to navigate the facility.

Dr. Pyant agreed that Defendant did not socialize much, or at all, with other inmates. Dr. Pyant testified Defendant was extremely withdrawn, kept to himself, and made no meaningful relationships or connections with any other person while at Butner. Dr. Pyant agreed that such gross social withdrawal can be a symptom of dementia and is not "normal" behavior. Likewise, Dr. Pyant agreed it is not normal behavior to remain almost motionless during a three-hour competency

6

hearing. Nevertheless, Dr. Pyant did not attribute Defendant's social withdrawal to dementia; instead, he concluded Defendant, who has some 21 prior arrests, was familiar with the legal system and was attempting to manipulate it.

Dr. Pyant testified Defendant's thought processes were consistently logical and coherent, but Defendant failed to give a good effort or try on tests, often responding, "I don't know." Dr. Pyant noted Defendant responded slowly to questions, but Dr. Pyant would have expected someone with even low functioning to try harder on the tests than Defendant did. When Defendant was placed in classes to restore his competency, he again did not try and Dr. Pyant concluded Defendant did not need to be *restored* to competence as he was competent and malingering or not trying.

Dr. Pyant also concluded Defendant's behavior at the time of his arrest indicated awareness, such as when Defendant admitted to the police he had a gun and said, "y'all really got me now," and when Defendant reportedly attempted to lie to the police. Dr. Pyant also thought it important that Defendant had numerous previous convictions (21), including convictions for crimes that involve at least some level of planning, and yet Defendant had never been found to suffer from any mental disease or defect in his prior court proceedings.

Dr. Pyant stated he could communicate well with Defendant on all subjects other than his criminal case, which is when Defendant would refuse to cooperate or shutdown. Dr. Pyant found Defendant could talk easily about his family and, in an attempt to facilitate communication, Dr. Pyant arranged a video conference for Defendant with his wife and attorney. Defendant seemed to act "worse" after that conference, which indicated to Dr. Pyant that Defendant was feigning or malingering. Dr. Pyant noted that he had much longer to evaluate Defendant than Dr. Brauman. He stated that even though the results of the VIP given to Defendant at Butner were the same results

7

obtained by Dr. Brauman, he reached a different conclusion about what the results meant based on his further observations of Defendant.

Dr. Pyant denied he was under any burdensome time constraints with respect to Defendant's examination and denied he became frustrated with Defendant. Like Dr. Brauman, Dr. Pyant thought that a neuropsychologist would be best able to judge Defendant's mental or cognitive abilities, thus he had Dr. Pennuto consult on the case.

Dr. Pennuto has worked at Butner since August of 2010. As a neuropsychologist, she studies how the brain functions. Dr. Pennuto opined that Defendant is competent, and she believes Defendant actively malingered in an attempt to feign incompetence, which indicates Defendant is capable of assisting in his defense if he chooses to do so. Dr. Pennuto concluded Defendant was malingering for several reasons. For example, Defendant indicated he could not complete a dot-to-dot test of numbers one to 20, but then he counted the same numbers without difficulty. Defendant's test scores were well below what would be expected from a lower functioning individual or even that of an individual suffering from mental retardation. At one point Defendant held his pencil in a strange manner and, when asked about it, said it was how he always held his pencil, but the next day he signed his name holding the pencil in a normal manner.

Dr. Pennuto wanted to do a full neurological work up on Defendant, but did not do so based on his performance on certain preliminary tests that occurred over two sessions in mid-March of 2013. These tests included the California Verbal Learning Test-II (CVLT-2) and selected subtests of the Wide Range Achievement Test-4 and Wechsler Adult Intelligence Scale IV. Dr. Pennuto agreed the CLVT-2 was largely a test of verbal memory and that effort tests developed for populations of normal intelligence may not be appropriate for persons with lower intellectual

8

functioning, however, she nevertheless believed that such tests were appropriate for Defendant. She testified that because she knew Defendant had a brain injury and low intellectual functioning, she used tests geared to his ability. The results of four out of the five tests she gave Defendant showed he was grossly underperforming and, on the fifth test, he only passed because he scored so low on both aspects of the test that it was impossible to measure the gap.

Dr. Pennuto also testified about the physical findings of Defendant's CT brain scan, which showed bullet fragments, mostly in the left temporal lobe, in Defendant's brain. While the majority of the remaining bullet fragments in Defendant's brain were located at or near the tip of the left temporal lobe, there were some fragments that went deeper into areas of the brain that involve language processing and reception. Dr. Pennuto testified the temporal lobe is extremely important to normal functioning and that temporal lobe damage is related to numerous mental health issues, such as short term memory loss, epilepsy, and attention deficit disorder. Dr. Pennuto agreed that Defendant suffers from seizures. Dr. Pennuto opined the right temporal lobe could and should compensate for the injury to Defendant's left temporal lobe to some degree.

Dr. Pennuto opined Defendant was competent to stand trial and assist his counsel. Dr. Pennuto stated that even though she was unable to do a full neurological work-up, thus making it impossible to accurately document the nature and severity of the deficits Defendant may have, she concluded Defendant was malingering and had the cognitive ability to feign incompetence.

Dr. Pyant and Dr. Pennuto did not agree with Dr. Solovey's choice of tests for Defendant, stating the results of a retest of the TOMM could demonstrate remembering the test, not actual achievement on it. Dr. Pennuto also said the results of the Dr. Solovey's IQ testing of Defendant (FSIQ of 74) were probably about the same results Defendant would have achieved prior to the

9

gunshot wound, based on Defendant's level of education and background. Drs. Pennuto and Pyant questioned the use of testing with hypothetical scenarios, noting a concrete (simple) thinker such as Defendant would not do well on such tests and would not respond well to long, hypothetical scenarios.

### C.     Third Evaluation

Dr. Solovey, a psychologist in private practice who mostly practices in therapy services, was the most recent evaluator of Defendant. While he is not a forensic psychologist, Dr. Solovey has testified several times for the defense in state and federal criminal cases regarding competency and mitigation issues; about 30% of his work is in criminal cases. Dr. Solovey saw Defendant for about five and one half hours in a private room at a local jail facility on September 7, 2013, making his examination the shortest, but most recent, of all of the examinations by the experts.

During his examination, Dr. Solovey administered the TOMM, and Defendant achieved about the same test results as he had during his first evaluation. Dr. Solovey agreed that giving the same test to a defendant could result in the defendant answering from memory, not from actual acuity, but he opined that the TOMM tests in this case were given sufficiently far apart that Defendant could not be answering from memory. Like Dr. Brauman, he did not give Defendant the third trial of the TOMM.

Dr. Solovey also used the MacArthur Competence Assessment Tool ("MCAT"), which is a test involving a series of hypothetical scenarios and questions based on those scenarios. Dr. Solovey agreed that someone with a low level of mental functioning is likely a more concrete (simple) thinker and, therefore, not proficient at dealing with hypothetical scenarios such as are found in the MCAT. Dr. Solovey's findings were very similar to Dr. Brauman's except he found

10

Defendant also suffers from post-traumatic stress disorder. Like Dr. Brauman, Dr. Solovey agreed a neuropsychologist would be most qualified to properly assess Defendant's cognitive abilities.

Dr. Solovey opined the MCAT test he administered to Defendant showed Defendant suffers from extremely poor verbal memory. He also noted that the ability to act, dress, and groom appropriately was not inconsistent with having an inability to understand and appreciate the legal system. Dr. Solovey concluded Defendant exhibited "clinically significant impairment" in many of the areas that would be necessary to have a rational understanding of the legal proceedings against him, such as reasoning ability, appreciation of legal procedures, appraisal of available defenses, planning strategy, assessment of possible outcomes, and the capacity to testify.

Based on the results of his interaction with Defendant, the test results, the anecdotal comments from another prisoner and guard indicating Defendant made no connections with others, and Dr. Brauman's previous report, Dr. Solovey opined Defendant was not currently competent to stand trial. Further, Dr. Solovey did not think it was likely Defendant could be restored to competency, although he seemed to hold this view in general and would defer to a neuropsychologist as to specifics.

### D. Counsel's Impressions

Counsel argues Defendant's demeanor at the competency hearing was virtually catatonic: he moved very little, quietly asked for some water a few hours into the hearing, and generally just stared ahead. Counsel states Dr. Brauman's report most accurately reflects his impressions of, and interactions with, Defendant. Counsel is particularly concerned that Defendant has an agreeable demeanor and is reluctant to disclose his comprehension problems, which suggests to counsel that Defendant may cooperate with the legal process without fully understanding it. Counsel is

11

concerned about whether Defendant actually understands the information relayed to him because, while Defendant has been able to effectively relay back basic information when asked to do so, Defendant has been unable to relay back complex information and also appears to have extreme difficulty remembering certain things.

## III.   ANALYSIS

### A.   Standard for Mental Competency

The standard for determining mental competency to stand trial or enter a guilty plea is a high bar: a criminal defendant must lack either a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" or "a rational as well as a factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam); *accord Drope v. Missouri*, 420 U.S. 162, 172 (1975); *United States v. Miller*, 531 F.3d 340, 350 (6th Cir. 2008). Mental and emotional problems do not equal incompetency. *See Miller*, 531 F.3d at 350 n.6. In addressing the competency of a defendant, a court may properly consider a wide range of factors, including the defendant's demeanor, medical opinions regarding competency, evidence of irrational behavior, the court's own observations, and the observations of defendant's counsel. *See Drope*, 420 U.S. at 172; *Miller*, 531 F.3d at 348; *Williams v. Bordenkircher*, 696 F.2d 464, 466 (6th Cir. 1983); *United States v. Tucker*, 204 F. App'x 518, 520 (6th Cir. 2006) (citing *Owens v. Sowders*, 661 F.2d 584, 586 (6th Cir. 1981)); *United States v. Jackson*, 179 F. App'x 921, 933 (6th Cir. 2006).

### B.   Burden of Proof

There is no clear answer to the question of who bears the burden of proof to establish pretrial competency. As might be expected, the government asserts the burden lies with Defendant to prove incompetency and Defendant asserts the government must prove competency. Both parties agree

the standard is a preponderance of the evidence.

The statute dealing with competency to stand trial, 18 U.S.C. § 4241, "do[es] not indicate who bears the burden of proof in a federal competency proceeding." *United States v. Riggin*, 732 F. Supp. 958, 962-63 (S.D. Ind. 1990).[3] In *Cooper v. Oklahoma*, 517 U.S. 348 (1996), the United States Supreme Court commented on a state's heightened standard of proof stating:

> Only 4 of the 50 States presently require the criminal defendant to prove his incompetence by clear and convincing evidence. None of the remaining 46 jurisdictions imposes such a heavy burden on the defendant. Indeed, a number of States place no burden on the defendant at all, but rather require the prosecutor to prove the defendant's competence to stand trial once a question about competency has been credibly raised. The situation is no different in federal court. Congress has directed that the accused in a federal prosecution must prove incompetence by a preponderance of the evidence.

*Id.* at 360-62 (citing 18 U.S.C. § 4241).

The language used by the Supreme Court appears to be *dicta* as the interpretation of 18 U.S.C. § 4241 was not at issue in *Cooper*. Several courts have, nonetheless, cited the language in *Cooper,* with little or no analysis, to hold a defendant must prove he lacks the mental competency to stand trial by a preponderance of the evidence. *See, e.g., United States v. Robinson*, 404 F.3d 850, 856 (4th Cir. 2005); *United States v. Sandoval*, 365 F. Supp. 2d 319, 320 (E.D.N.Y. 2005); *United States v. Rudisill*, 43 F. Supp. 2d 1, 3 (D.D.C. 1999). Other cases hold the government bears the burden of proving by a preponderance of the evidence that a defendant is competent to stand trial.

---

[3] The court in *Riggin*, also noted when Congress so desired, it had no problem setting forth a clear assignment of the burden of proof to the defendant concerning the defense of insanity. *Riggin*, 732 F. Supp. at 963. *See, i.e,* 18 U.S.C. § 17(b) ("The defendant has the burden of proving the defense of insanity by clear and convincing evidence."). No such clear assignment of the burden of proof appears in 18 U.S.C. § 4241.

*See, e.g., United States v. Velasquez*, 885 F.2d 1076, 1089 (3rd Cir. 1989); *Brown v. Warden, Great Meadow Corr. Facility*, 682 F.2d 348, 353 (2d Cir. 1982); *United States v. Merriweather*, 921 F. Supp. 2d 1265, 1291 (N.D. Ala. 2013); *United States v. O'Kennard*, No. 02 CR 481, 2004 WL 1179391, *6 (N.D. Ill. May 27, 2004); *United States v. Cole*, 339 F. Supp. 2d 760, 762-63 (E.D. La. 2004); *Riggin*, 732 F. Supp. at 963. And, at least one circuit seems to favor placing the burden of proof on the proponent of incompetency. *United States v. Izquierdo*, 448 F.3d 1269, 1276-1277 (11th Cir. 2006) (placing burden on a defendant seeking to withdraw his guilty plea on the alleged basis of incompetency).

The parties' briefs appear to have addressed the burden of proof under 18 U.S.C. § 4241(d), which deals with determination and disposition to commitment. An additional twist in this case, however, is that the Court has already determined by agreed order that Defendant was incompetent under 18 U.S.C. § 4241(d) and he was committed for restoration. Thus, the issue at hand may be the proper allocation of the burden to prove Defendant "has recovered to such an extent that he is able to understand the nature and consequences of the proceedings against him and to assist properly in his defense" under 18 U.S.C. § 4241(e). It appears the burden of proving a defendant who was previously found incompetent is now competent may be allocated to the government. *See United States v. Baldwin*, 1:10-CR-146, 2012 WL 5205814, *2 (W.D. Mich. Oct. 22, 2012) ("The circuits are split as to which party bears the burden of proving by a preponderance of the evidence that defendant is incompetent at a competency hearing. The court agrees with both parties' position that the burden is properly on the government in the somewhat unique circumstances of this case, where the court has already found that defendant is not competent to stand trial and the government is seeking a reversal of that finding."). It is not necessary to belabor this point further, however,

14

because allocating the burden of proof under 18 U.S.C. § 4241(e), as opposed to 18 U.S.C. § 4241(d), is likely a distinction without a difference.

Placing the burden on the government to show Defendant is now able to understand the nature and consequences of the proceedings against him and is able to assist properly in his defense would appear to facilitate the interests of justice and of the Court to ensure Defendant does not go to trial or plead guilty while incompetent in this case. The assignment of this burden in this matter, however, is not crucial to the outcome. As stated, in *Medina v. California*, 505 U.S. 437 (1992), "the allocation of the burden of proof to the defendant will affect competency determinations only in a narrow class of cases where the evidence is in equipoise; that is, where the evidence that a defendant is competent is just as strong as the evidence that he is incompetent." *Id.* at 449 (citing *United States v. DiGilio*, 538 F.2d 972, 988 (3rd Cir. 1976)). As will be discussed more fully below, the evidence concerning Defendant's competency is not in equipoise.

## C.     Application

In making a recommendation in this case, I have considered the testimony of each doctor as well as each doctor's report, the demeanor and behavior of Defendant, the various impressions of counsel, and my own observations. The change of plea hearing conducted by the undersigned was not unusual in any significant way. Defendant's answers to my questions were responsive and he appeared coherent and lucid, albeit very cooperative. Moreover, both Defendant and his attorney responded that Defendant was aware of what he was doing. In contrast, in the competency hearing, Defendant appeared very still and withdrawn, and his counsel shared concerns that Defendant had been overly cooperative in the past without the requisite understanding. Given these conflicting presentations, I rely heavily on the doctors' opinions and reports to resolve this issue.

15

Dr. Pennuto's and Dr. Pyant's opinions stand in stark contrast to Dr. Brauman's and Dr. Solovey's opinions regarding Defendant. Simply because each side has presented favorable testimony from two doctors does not make the evidence in equipoise. Because the Court is tasked with analyzing conflicting and irreconcilable testimony from multiple expert witnesses, I will explain the weight I have given to each doctor's testimony.

First, I find the opinions of each doctor to be sincerely held within their area of expertise. The practice of forensic psychology within the BOP requires the doctors to recognize that while performing forensic work, his or her obligation is to the justice system, specifically the court, and not to the United States Attorney's Office. The doctors must remember that he or she is presenting an informed opinion, not a fact, and they should not be invested in any particular outcome. While the private psychologist hired by Defendant had no obligation to the court per se, he also seemed sincere in his opinion. I conclude the professional credibility of each doctor was not successfully challenged by any party.

Second, I have considered the expertise of each doctor. I have given more weight to the opinion of Dr. Pennuto as she was the only neuropsychologist to evaluate Defendant and the other doctors seemed to defer to her expertise to varying degrees. Dr. Solovey is not a forensic psychologist and, thus, I accord his opinion somewhat less weight than the opinions of the two forensic psychologists, Dr. Brauman and Dr. Pyant, even though he has been a psychologist far longer than the other experts.

Third, I have evaluated the duration and interactions of the doctors with Defendant. Dr. Solovey evaluated Defendant over the shortest amount of time so I accord his opinion less weight. The opinions of Dr. Brauman and Dr. Pyant are mostly at odds, but Dr. Brauman evaluated

Defendant over a far shorter time period and without the benefit of a neuropsychologist's opinion, therefore I accord her opinion less weight than Dr. Pyant's opinion.

As a result, I accord more weight to the opinions of Dr. Pennuto and Dr. Pyant that Defendant is currently competent than to the opinions of Dr. Brauman and Dr. Solovey that he is (or was) incompetent. Having carefully reviewed Defendant's demeanor and behavior, medical opinions regarding competency, and the parties' arguments, I **FIND**, by a preponderance of the evidence, Defendant is able to understand the nature and consequences of the proceedings against him and is able to assist in his defense. Therefore, I conclude Defendant is currently competent to stand trial or enter a guilty plea. *See Dusky*, 362 U.S. at 402.

A finding of competency does not mean Defendant does not have cognitive deficits. The evidence supports finding that Defendant is withdrawn, has a low IQ, and is a simple thinker who has poor verbal memory and can be expected to have difficulty with complex hypothetical questions. The Court (and counsel) should be able to accommodate this aspect of Defendant's situation by taking appropriate steps to: (1) simplify the proceedings wherever possible by paraphrasing complex concepts into familiar terms and avoiding legal jargon; (2) slow down the proceedings and repeat information as needed, allowing ample time for Defendant to ask and respond to questions; and (3) allow breaks in order to provide opportunities for counsel to discuss information and developments with Defendant as needed.

## IV.    CONCLUSION

Having carefully reviewed Defendant's demeanor and behavior, medical opinions regarding

competency, and counsel's opinion, I **RECOMMEND**[4] the Court find Defendant is able to understand the nature and consequences of the proceedings against him, is able to assist in his defense, and, therefore, is competent to stand trial or enter a guilty plea.

s/ *Susan K. Lee*

SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[4] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b)(2) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).